Good morning and welcome to the Ninth Circuit. We have three cases for argument today, but before we get to those cases, we have two cases that will be submitted and I will go ahead and submit them now. Rosales v. United States Department of the Interior and Top Agent Network, Inc. v. the National Association of Realtors. Both of those cases will be submitted as of this day. The first case for argument is Davis v. Pinterest, Inc. and so, counsel, whenever you're ready. May I proceed? Good morning. May it please the Court, my name is Sue Naum from the law firm of Reese, LLP, representing Plaintiff Appellant Harold Davis. Mr. Davis is an visual artist. He is universally admired by peers, by critics, by connoisseurs of photographs, and by the casual viewer. He has been honored with a prestigious Photographic Society of America Progress Award and he's one of the few living artists whose works have been reproduced by the United States Post Office as a stamp. Mr. Davis alleged a claim of direct copyright infringement against Pinterest for 51 federally registered copyrights, a small number from his extensive portfolio of registered photographic works. The district court granted summary judgment to Pinterest based on the DMCA safe harbor, specifically under Section 512C. Mr. Davis asked this court to overturn the lower court's decision because it made four errors of law. First, the district court ignored this court's binding precedent in Mavericks and Motherless. This court held that to meet the threshold required... May I ask you a question, please? Absolutely. You seem to be drawing a distinction between whether a website or social media platform passively shows advertisements next to a copyrighted versus using algorithms to target advertisements towards a particular user. We do make that distinction. That's right. Is that the distinction you're making? And so, can you just explain what that passive... What does that mean and why does it matter if the issue is accessibility versus revenue, whether it's passive or active? Absolutely, Your Honor. First of all, we want to make sure that this court understands we are not challenging Pinterest's advertisement or its business model at all. We are actually asking this court to consider Mr. Davis's exclusive right to display his work, publicly display his work. And there's no question that when Pinterest displays Mr. Davis's work, regardless of on what surface, it is actively displaying that work in a public manner, which is absolutely covered by the Copyright Act. So when we have this discussion of passive versus active advertisement, that's really in the context of Pinterest's defense, if it's affirmative defense under Section 512C. The problem with the district court's analysis, and really the problem with Pinterest's analysis, is that it shifts that burden onto Mr. Davis. Mr. Davis has proven his, or at least alleged, his prima facie case. He has a registered federal copyright, and Pinterest displayed that work publicly. As this court recently held in Hunley versus Instagram, the server test... Could I ask you a question, though? If Pinterest meets its threshold burden of showing a Safe Harbor applies, doesn't the burden shift back to Mr. Davis to show that the Safe Harbor doesn't apply? Absolutely, Your Honor. I assume you embrace that burden, right? We absolutely do. The problem here is that the district court never talked about the actual standard that this court held in Mavericks and Motherless, about what that initial threshold requirement is. And in Mavericks and Motherless, both times this court could not have been clearer about its activities were narrowly directed towards enhancing the accessibility of the post. Now, the district court and Pinterest simply disregards the words narrowly directed. It never cites it in its decision, and Pinterest doesn't even cite it in its brief. It literally edits out the words narrowly directed from its of law. Can I ask, though, you're saying you don't challenge Pinterest's business model, but if you were for a veil, they wouldn't be able to do any advertising next to a pin. Is that correct? That is not correct, Your Honor. And really, what I think Instagram Hunley case really talks about is what does a court do? Does it make its own laws? Does it affect policy? No, it does not. It applies the held by a court in precedent. And I don't think Pinterest is arguing about the standard that is precedent here. At least it's unclear from their briefing. They avoid this issue altogether. And so what we're saying is, let's have the standard and then let's apply that standard to the facts. That was never done in this case. The district court, first of all, doesn't really articulate a standard. Instead, it jumps right into the facts and says, Oh, the facts here are like, you know, other cases. But the way that really courts analyze the law is first it puts out a standard and then it talks about the facts. And that's all we're asking here is, I guess, does it matter if it's all about the safe harbor? I'm sorry. You're on it. Go ahead, Judge. Go. I guess I'm still unclear on what advertisement you think is lawful and wouldn't be implicated by the Safe Harbor Act. Your Honor, I think there has been some precedent already established by this court about the confines of what is narrowly directed towards accessibility. For example, we can all agree that if you code certain content so it's easily downloadable, uploadable, that that's safe. Another aspect that this court has said is safe is if you provide access to content that the user directs. For example, if the user posts many things that are popular, it's on the most popular list. That's purely user-directed. Or, for example, in terms of advertisement, if you have advertisement that's just on the side, it doesn't have to do with the content of the user. It's just passively displayed on the side as many websites do. I think those are all well established. And Mr. Davis took pains to... Well, which case establishes that passive ads on the side don't implicate the Safe Harbor provision? For example, in Motherless, we were talking about a website that had certain advertisement on the side, and that's how a lot of websites make money. I think that example shows that this court implicitly acknowledged that, yeah, you can make money on a website. You can show ads on a website. But what we are asking for this court to reaffirm what it already established as a standard. Could you explain why this is not passive ads on the side? Is it because of the algorithm or the variant issue? What are you saying takes us away from passive ads on the side? That's right, Your Honor. So when you get onto Pinterest, and you have your own personal board, and that's all the material that you've put on your own personal board. But then Pinterest shows you other surfaces, it calls it, where it integrates both what it calls originals and promoted pins. So there are images. Yeah, you see more, yeah. Exactly, or buy this, or... Some of them are promoted, some of them are not. Exactly. And it all tracks... That still seems like passive ads on the side. Well, Your Honor, even if we could agree on the advertisement, we also think that when the court refused to look at notifications, that is an instance where they are taking content, and they're shooting it outside of their website. No court has ever blessed... Yeah, that's a separate issue dealing with evidentiary issues. It is. Okay, so putting that aside for now, just talking about the promoted pins and the pins, that does seem like passive ads on the side. Is there any other distinction you're trying to draw? Well, I guess what we were trying to draw is that, unlike passive ads, Pinterest actively controls how advertisements are displayed, and it is not simply based on the user putting any input. It very much relies on what the advertising goal is, what the advertisement is, and there's no question that Pinterest controls that grid view. And so, I think it attempts to slice and dice, sure, there are these pins and these pins, but the reality is that there is a grid view, and you can't unsee it. This is not like YouTube, where you can choose to watch the video and the ads associated or not. Can I ask, are you challenging the factual question of the embeds that... The district court held there was nothing really embedded in the variant. Are you okay with that holding, or are you challenging that as a factual matter? You know, I think that there is... We would like to go to the jury on this issue, but I think the district court made a factual determination there. We are really talking about legal errors. Can I ask you, I am looking at Motherless, and I don't see it as addressing how a service provider displays ads alongside user uploaded content. I certainly don't see this passive versus, you know, algorithm-driven, targeted ads language at all. No, Your Honor. For any particular page you want us to consider? Absolutely, Your Honor. I am citing Motherless at 6.06 and Mavericks at 10.56. We are really focusing on the standard that this court laid out, the precedent and the holding. There are factual distinctions between Motherless and Mavericks in this case, but we are really going to the heart of the issue, which is, what is the standard? And then we can apply it to the facts. Both the district court and Pinterest simply ignore the standard. They simply edit out the notion of narrowly directed. Now, that is a key part of the standard articulated by this court. It'd be like in the First Amendment context to say, take out the strictly and the strict scrutiny. These words matter. They give weight and heart to the interpretation. But what are you saying violates that narrow directness? Well, we identified three specific activities that violate it, Your Honor. And specifically, we definitely articulated that the creation and storage of these variants to track user engagement was a violation. But I understand that Your Honor is dubious of that. Secondly, we articulated that the public display of Mr. Davis's works on website surfaces that Pinterest alone controls is a violation of his exclusive display rights. And then finally, we said that Pinterest's public display of his works outside of the platform in notifications via email and push notifications were a violation. And you're not challenging the creation of the variant by itself? By itself, no, we are not. To me, it seems to be the most non-narrow. But anyway, do you want to reserve some time? I do, Your Honor. Thank you. May it please the Court, Fred Rowley, Jr. for Pinterest. I'd like to first address the argument that my friend made about the standard, and then I'd like to get right to the advertising-related questions that Judge Koh and Judge Bumate asked about. So on the standard, I think it's important to note that Motherless acknowledges Mavericks and the narrowly directed standard in its analysis and yet upheld functions and processes that are on all fours with the processes that are at issue here because they facilitate access to user-uploaded content. So Motherless acknowledged that standard and simply held that features like these that permit users to more easily find user-uploaded content fall squarely within the scope of the safe harbor. So there's really no dispute about the standard. And the district court below applied in straightforward fashion the holdings of UMG and Motherless to processes that facilitated access, just like the algorithms and also the variant creation that the plaintiff seems to be challenging here. Now, Judge Koh and Judge Bumate both asked about advertising and whether that ousts the display of user-uploaded works from the safe harbor. And we submit that the district court correctly concluded that it did not for a few reasons. First, there's a couple of factual issues about the way that Pinterest platform operates that are worth clarifying. As Judge Bumate noted the precedent actually doesn't address that issue directly. Which precedent, Your Honor? We would agree that these cases don't address the issue of whether putting it into the context of advertisement, a commercial purpose for Pinterest somehow changes the analysis for purposes of whether the safe harbor applies. Right, Your Honor. They don't analyze them. I think it's worth noting that in both UMG and Motherless, the platforms had advertising. This is a point that the district court noted. In UMG, so it's not analyzed, but in the factual background you can see that. In UMG, the platform generated revenue from advertising. And it says, quote, displayed along with the videos. Right? So there was advertising alongside the videos. And there was no suggestion in the analysis that that somehow ousted the display of user-uploaded works from. Can I ask you, if this is summary judgment and we have to draw all inferences in favor of Mr. Davis. Yes. Isn't there at least a triable issue of facts? There isn't, Your Honor. On whether, you know, Pinterest's variants and its algorithms are really tracking user activity for revenue generation and advertisement and not for accessibility for users. Your Honor, there's a couple of issues, and I think that are worth clarifying, and the district court addressed them. The first is this embedding issue that Judge Bumate noted. This is not a fact-finding by the district court. What the district court concluded, and I'll just quote, was that there was no evidence at all that Pinterest embedded information or data into the variants it created. I'll just quote from the district court. The evidence in this case indicates — I'm sorry. What the district court concluded was that there is simply no evidence in the record that Pinterest embeds anything within PINs generally or plaintiffs' works specifically to create or obtain signals for its advertising algorithms. So this — the district court concluded this on summary judgment. There was no triable issue of fact. There was simply no evidence of that. The second point that's worth clarifying is how the algorithms operate. Because my friend, Ms. Nam, suggested that Pinterest takes organic PINs, user-uploaded content, and directs them toward ads, kind of conscripts them for advertisements, and that's not the case. The district court specifically addressed this as well and noted that the algorithms that apply to user-uploaded content, organic PINs, are separate from the algorithms that apply to promoted PINs or advertisements. And I'll read again from the district court's order. The algorithms that select whether and how to display plaintiffs' works, user-uploaded works, in Pinterest feeds are thus still promoting user access to user-uploaded content. And that's because, I'll quote again, the evidence in this case indicates that the algorithms used to identify and display organic PINs are separate from the algorithms used to identify and display promoted PINs. But there was a broader point to make about this. And the district court noted this, too. Advertisements don't even implicate a copyright interest and neither does, quote, user tracking, as the plaintiff says, which is just the operation of the algorithm. Those don't even implicate a copyright interest because they don't involve copying. They don't involve duplication or display. Those features don't do that at all. And so they simply don't bear on copyright infringement. They simply don't bear on the safe harbor's operation because the safe harbor, if you look at the plain text of the safe harbor, only cares about whether the display here of the works is, quote, by reason of the storage at the direction of a user of material that resides on a system. Is, did the user direct that the content be uploaded? That's why this is. Is there any limiting? Oh. Go ahead, Your Honor. Is there any limiting principle? Would there ever be any use of ad targeting algorithms or display of advertisements along user uploaded content that would not be covered? Your Honor, I think. By the safe harbor? And what is that? There are limiting principles, Your Honor, and they're in the text of the statute. Right? So it has to be infringement, which would involve something that you do with the user uploaded content. Right? That's what the word infringement invokes. By reason of the storage at the direction of a user. So I think in Mavericks, the court concluded that what was happening in that case where the platform was curating content, deciding what to put on. If you did something like that, right, it's no longer user directed. It's platform directed. So you're going back to the passive versus active. I'm not, Your Honor. I'm saying that they're just limiting principles. With respect to advertising, I don't think that this record, that that issue, that distinction between active or passive is even really presented here. But I also don't think that that distinction matters for purposes of the statute. But I'm trying to respond to Judge Koh's question about whether there's a limiting principle in general. And I do think that there are limitations that are fixed by the statute and this court has recognized them before. So if a platform were to. If Pinterest added data or information to its variants for use with the algorithms for advertising, would you agree the safe harbor wouldn't apply? If, Your Honor, if what you mean is that if a platform conscripted user uploaded content and made an ad out of it, right, at that point it wouldn't be at the direction. No, no, that's not the hypo. If you added any data or information to change the variant for use with advertising algorithms. It depends. I'm saying, sure, it's converting that uploaded content into an ad. I'm just saying if you added any data or any information to the variants that you create for user uploaded content and use that changed variant for ads, would that be covered? So first, I want to be clear, that's not this case, right? The record doesn't support that. But I think the answer to your question, Your Honor, is it depends, right? If you are creating new content, right, you fall outside of the safe harbor on the plain text of the statute. If what you're doing instead is you're adding data and you're displaying the user uploaded content, you're displaying it, you're making it more accessible to other users, you are facilitating access, as this court has reasoned in UMG and Motherless, that would still fall within the scope of the safe harbor and it wouldn't matter that it's alongside advertising. The safe harbor just wouldn't care about that. But if you cross the line and you are no longer facilitating access to user uploaded content, right, to if you're displaying something that is no longer by reason of the storage at the direction of a user, that might be different. But that issue isn't even presented in this case. So I thought Pinterest was arguing that by reason of is similar to but-for. Or are you not arguing that? I mean, Your Honor, I don't think that the hypo you just said, it doesn't seem to suggest the but-for. I don't think the court needs to resolve, you know, whether it's but-for or approximate causation here because the precedents, we think, as the district court noted, apply so squarely here. I mean, the algorithm is on all fours with, for example, the algorithm that was used in YouTube to recommend related videos, right? In YouTube, you also had an algorithm and it based upon the user's activity, the search they did for video, observing the video. It recommended related videos and you have an algorithm here. The fact that the algorithm might work better and make it easier for users to find the user-uploaded content that they want doesn't change the analysis. It is fundamentally access facilitating and that's why those precedents apply directly here, as the district court noted. You know, and I would also note that in UMG, even that platform, it extracted metadata in order to make the videos searchable. And in Motherless, you had these software features that organized the user-uploaded content, right? They created groups based upon information supplied by the user, like tags and titles. Pinterest does the same thing with the content that's uploaded by users here. It takes the user-supplied tags, titles, the image itself, and then makes that image more accessible. And the fact that it does that by analyzing what other users might be interested in simply doesn't change the analysis. I can ask when it analyzes an image, it could say it knows it's a flower, for example. If it's an image of a flower, it can analyze and say, this is a flower. Yes, Your Honor. But that just makes it easier to find. No, yeah, I just was curious about the technology. Is that through hash? Are those hash codes? Or is that something totally different? So I think a user is able to describe the post that they're making, the pin. They can sort of describe the image that they're posting. And they have boards, too, right? So the board that a user has created is also something that will be relevant in trying to make it more accessible to other users. But you had the same kind of technology at issue in Motherless, right, where a user would supply the title of a video and a tag, and that would be picked up by the software. Just to pick up on Judge Coe's question, if there was an embedding here, and I take it that the district court found no evidence of that, would that take it out of the safe harbor? Your Honor, I think the way that I think about it is it depends, right? It depends on whether... Why? Because it depends on whether you're still just facilitating access to user-uploaded content, or you're going beyond that such that it is platform-directed and not user-directed in the sense that users, when they upload content, when they upload an image to a platform like this, they're not only directing that it be stored, but the whole premise of the safe harbor... ...is to advertise the PIN, or associate advertisements with the PIN. I don't think that that would change the safe harbor analysis. Not presented on this case, but I think that alone actually wouldn't change the safe harbor analysis because you would still be facilitating access to user-uploaded content. You know, and it would still... It would simply be that it's bound up with a revenue source or advertising, but that doesn't change the operation alone. That alone doesn't change the operation of the safe harbor, and that only makes sense, right? Because... Could we go back to the summary judgment? You rely heavily on the district court's factual findings, but my understanding, and Ms. Nam can correct me, is that Mr. Davis disputes those factual findings, that he interprets the Deschamps' deposition testimony differently. He interprets the internal Pinterest document differently. He views the declarations differently. So why isn't that a material factual dispute that would preclude summary judgment? The reason is, Your Honor, and I think the district court explained this, is that the plaintiff seems to confuse what embed means in the factual sources that Mr. Davis cites. And the sense in which the plaintiff means embed is to graft data or graft information onto the variant, and as the district court noted, there's simply no evidence of that. I'd like to quickly just make one more point about this advertising line of questions, because I do think that if it were enough that otherwise protected activities, like algorithms that facilitate user access, I mean, access to user-uploaded information, if that were enough to oust you from the safe harbor, there would be no need for the statutory carve-out in 512c1b, which is the carve-out for service providers who derive a financial benefit directly attributable to the infringing activity. There'd be no need for that, because an indirect financial connection would be enough to vitiate the safe harbor protection. I also think that that result would be inconsistent with this Court's observation in UMG, that mere storage lockers are not, do not delimit the scope of the safe harbor, that it goes beyond mere storage lockers to platforms that facilitate access to user-uploaded content. Can I make one final point? Go for it. I do think that the plaintiff's theory has evolved and even evolved beyond what they are arguing, what they argued in the district court here, because there is this suggestion that the use of the algorithms to track user activity somehow itself takes you outside of the safe harbor. So I just want to quote from the reply to the, I'm sorry, the opposition to the motion for summary judgment, because I think that their theory there was narrower, and the district court says this in its order, that it's just focused on advertising. They specifically said that they do not contend that Pinterest exceeded the scope of the DMCA safe harbor by converting user-submitted content into standard display formats, what I think means creating variants, by coding content to enable users to locate and gain access to material uploaded by other users, making it searchable, or by using its algorithm to suggest that related content that was uploaded by users. The algorithm. Thank you, counsel. Thank you, Your Honor. Ma'am. Thank you, Your Honor. What evidence was presented to the district court to rebut the definition that Pinterest provided about, because there does seem to be a fundamental disagreement about what embed means. And, you know, as a term of art, what evidence was presented to rebut the expert testimony and the definition of embed such that you could argue there is a fact issue about whether variants were, in fact, created by the process used by Pinterest for Mr. Davis's original art? Thank you, Your Honor. First of all, there was no expert testimony. This was Pinterest's own employees that explained what they do with their variants. And there was no dispute that it's Pinterest that controls what's on those variants. It used to have certain codes about the ownership and title that the photographer would put onto those files. And then it suddenly started to put that information back on because it was worried about this litigation. So it is the only entity that controls what's on those variants. So whether we call it adding or subtracting, that is what Pinterest does on its own. And I want to go back to this notion about the standard here, because we keep on talking about the standard as if it's just facilitate access. That is not the standard that this court has laid out. It's narrowly directed. That is a key element of the standard that this court laid out in its binding precedent. This court's not allowed to ignore that, and certainly the district court is not allowed to ignore that. And I see my time is coming up, but I just want to make one point, which is that Mr. Davis on appeal is not asking for anything novel or really uncontroversial. It is just asking this court to affirm the basic principle that the law is the law, whether you are an individual or you're big tech. And unfortunately, given the state of affairs, I think we all need that assurance that the law is the law, that words matter, that art matters. Thank you, Your Honor. Thank you, counsel. This case is submitted.
judges: BUMATAY, KOH, DESAI